[No. A129379. First Dist., Div. Five. May 4, 2012.]

RITA BETTENCOURT et al., Plaintiffs and Appellants, v.
HENNESSY INDUSTRIES, INC., Defendant and Respondent.

[No. A130211. First Dist., Div. Five. May 4, 2012.]

DONALD PEARSON, Plaintiff and Appellant, v.
HENNESSY INDUSTRIES, INC., Defendant and Respondent.

[No. A131063. First Dist., Div. Five. May 4, 2012.]

NOEL SHUSTED et al., Plaintiffs and Appellants, v.
HENNESSY INDUSTRIES, INC., Defendant and Respondent.

[No. A131071. First Dist., Div. Five. May 4, 2012.]

SANDY SIEGEL et al., Plaintiffs and Appellants, v.
HENNESSY INDUSTRIES, INC., Defendant and Respondent.

1104

Counsel

Brayton Purcell, Alan R. Brayton, Lloyd F. LeRoy and Richard M. Grant for Plaintiffs and Appellants.

Gordon & Rees, Roger M. Mansukhani, Steven A. Sobel, Matthew G. Kleiner and K. C. Swisher for Defendant and Respondent.

---

Opinion

**JONES, P. J.**—These consolidated appeals seek reversal of judgments entered in favor of respondent Hennessy Industries, Inc. (Hennessy).[1] Hennessy, the manufacturer of brakeshoe grinding machines, is one of a large number of defendants against whom plaintiffs brought personal injury or wrongful death and survival actions. Plaintiffs claimed the use of Hennessy's machines to grind asbestos-containing brake linings resulted in exposure to airborne asbestos fibers that caused injury. Plaintiffs sought recovery under several theories, including strict products liability and negligence.

Hennessy moved for judgment on the pleadings in all of plaintiffs' cases, arguing it could not be held liable as a matter of law because it did not manufacture or distribute the asbestos-containing brake linings, which Hennessy claimed were the cause of plaintiffs' injuries. The trial court agreed, finding that plaintiffs' injuries were the result of defects in the products of other manufacturers for which Hennessy was not responsible. It granted Hennessy's motions and denied plaintiffs leave to amend their complaints. The court entered judgment in Hennessy's favor on all of plaintiffs' causes of action, and plaintiffs appealed.[2]

We conclude plaintiffs could have cured the defect in their complaints by amendment. We therefore hold it was error to grant judgment on the pleadings to Hennessy and an abuse of discretion to deny plaintiffs leave to amend their complaints with respect to their causes of action for strict products liability and negligence. We therefore reverse the judgments with regard to those causes of action.

---

[1] The appellants in the Bettencourt, Shusted, and Siegel cases are the decedents' successors in interest and heirs at law. Appellant Donald Pearson sued in his own right in the court below. For the sake of convenience, we will refer to the appealing parties collectively as "plaintiffs" save when the context requires that they be identified individually.

[2] These cases are among the "21 separate appeals pending before this court, all involving plaintiffs who pleaded similar causes of action based on [their] law firm's Master Complaint." (*Shields v. Hennessy Industries, Inc.* (2012) 205 Cal.App.4th 782, 785, fn. 2 (*Shields*).)

Factual and Procedural Background

These appeals challenge a grant of judgment on the pleadings, and we accept as true the factual allegations in plaintiffs' complaints. (*Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 515–516 [101 Cal.Rptr.2d 470, 12 P.3d 720].) Because all of these allegations are deemed admitted for purposes of a motion for judgment on the pleadings (*Ludgate Ins. Co. v. Lockheed Martin Corp.* (2000) 82 Cal.App.4th 592, 602 [98 Cal.Rptr.2d 277] (*Ludgate*)), we draw our statement of facts from plaintiffs' "master complaint," their individual case-specific complaints, and the proposed amendments to the complaints plaintiffs filed in the trial court.[3]

### *The Plaintiffs*

Between 1958 and 1996, William Bettencourt worked in various occupations in which he was exposed to asbestos and asbestos-containing products. He also suffered nonoccupational exposure to asbestos from performing maintenance and repairs on cars, trucks, and motorcycles. Bettencourt was diagnosed with asbestosis, asbestos-related pleural disease, and right lung cancer in about 1984. He was diagnosed with bladder and kidney cancer in about 2004, left lung cancer in about 2005, and received another diagnosis of right lung cancer in about 2006. He died October 10, 2007.

Donald Pearson served in the United States Army and worked as a machinist, mixer, gas station attendant, and mechanic. Between 1958 and 1993, he was exposed to asbestos and asbestos-containing products at various places of employment. He also suffered nonoccupational exposure when he changed and removed the brakes on different vehicles. In the process, he used grinding and arcing machines to shape the new brakeshoes. Pearson was diagnosed with asbestosis and asbestos-related pleural disease in about May 2008.

Shusted's decedent, Margaret Hauck, experienced para-occupational exposure to asbestos from her father's and husband's dirty work clothing. Hauck lived with her father between 1942 and 1960, during which time he worked

---

[3] In the Bettencourt appeal, Hennessy contends we may not consider the proposed amendment because it was not timely presented below. But a plaintiff's showing that a complaint can be amended to state a cause of action may be made for the first time in the reviewing court. (*Dudley v. Department of Transportation* (2001) 90 Cal.App.4th 255, 259–260 [108 Cal.Rptr.2d 739].) Moreover, in the Shusted and Siegel cases, the parties agreed to a procedure in which the plaintiffs were allowed to file a supplemental opposition consisting of their proposed amendments. Thus, the proposed amendments are already part of the record on appeal, and our consideration of them serves the interests of judicial economy. (See *Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1386–1387 [272 Cal.Rptr. 387].)

as a millwright and service engineer. He was exposed to asbestos from the 1930's until 1973 at various places of employment. Hauck lived with her husband from 1962 until 1999, during which time her husband operated an automobile repair business where he was exposed to asbestos. He also performed brake replacement jobs on his personal vehicles, as well as those belonging to family and friends. Hauck was exposed to asbestos from washing her husband's dusty clothes and from home remodeling work. She was diagnosed with mesothelioma in about August 2008, and died October 9, 2008.

John Siegel was exposed to asbestos-containing products at numerous workplaces between 1964 and 2000. He was diagnosed with lung cancer in about April 2006, and died on April 24, 2008.

### Hennessy and its Product

Hennessy engaged in the design, manufacture, and distribution of brake-shoe grinding machines.[4] The only intended use of the machines was for grinding brakeshoe linings to match the size and shape of the brakeshoe to the brakedrum for full braking efficiency.

During the periods relevant to this litigation, all brakeshoe linings used on automobiles, light trucks, and commercial trucks in the United States contained asbestos. Hennessy knew or should have known its brakeshoe grinding machines would be used by consumers and workers in conjunction with asbestos-containing brake linings. Its machines were specifically designed for grinding such brakeshoe linings and had no other function. Plaintiffs allege this was the inevitable use of Hennessy's machines.

Until subjected to Hennessy's product, asbestos fiber bundles were physically bound or otherwise attached in a "matrix" in the nonfriable asbestos brake lining. As they were designed to do, Hennessy's machines ground and abraded the hard linings and subjected them to pressures, temperatures, and force, making portions of the lining into a fine powder and releasing the formerly bound-up asbestos as airborne fibers. The airborne fibers presented a significant danger to human health, as they would be inhaled by anyone in the area around the brakeshoe grinding machine during or after its use. The use of Hennessy's products led to inhalation and ingestion of those asbestos fibers, which cause serious disease, including asbestosis, other lung damage, cancer, and even death.

Hennessy's machines were unsafe and dangerous for use, both because they were negligently manufactured and designed, and because Hennessy

---

[4] In their briefs, the parties also refer to Hennessy's products as "brake arcing machines."

failed to warn of the danger from exposure to asbestos fibers released from the brake linings by the intended use of its machines. The machines failed to protect against exposure to asbestos fibers, although Hennessy could have designed and built them with features that would have prevented the exposure. The design defects include the lack of effective dust collection mechanisms and/or the failure to ensure that the machines' abrading mechanism did not come into contact with the asbestos-containing brake linings until achieving sufficient revolution velocity, temperature, and pressure, so as to convert the asbestos fibers into inert "forsterite," a substance which would not have presented any danger to humans.

### The Actions Below

Plaintiffs filed complaints for wrongful death or personal injury in San Francisco Superior Court. They alleged a number of causes of action against Hennessy, but only two—those for negligence and strict products liability—are at issue in these appeals.[5]

Hennessy moved for judgment on the pleadings in all of the cases. Relying principally on our opinion in *Taylor v. Elliott Turbomachinery Co. Inc.* (2009) 171 Cal.App.4th 564 [90 Cal.Rptr.3d 414] (*Taylor*), Hennessy contended it could not be held liable under either negligence or strict products liability for asbestos-containing products manufactured, marketed, and distributed by other entities. Briefly stated, Hennessy argued it was not liable because plaintiffs did not allege Hennessy had placed an asbestos-containing product into the stream of commerce. (See *id.* at pp. 575–579 [explaining that Cal.'s " 'stream of commerce' " theory of products liability generally restricts strict liability for failure to warn to entities in the chain of distribution of the defective product].) Since plaintiffs alleged their injuries were the result of exposure to inherently dangerous asbestos released from brake linings produced by others, Hennessy asserted its product did not cause or create the risk of harm to plaintiffs. Under *Taylor*, Hennessy argued, it could not be held liable as a matter of law.

Plaintiffs opposed Hennessy's motions, arguing *Taylor* was both wrongly decided and factually distinguishable. Plaintiffs contended their cases were controlled by the Second District's opinion in *Tellez-Cordova v.*

---

[5] In this court, plaintiffs challenge only the grant of judgment on the pleadings with respect to their causes of action for negligence and strict liability. Plaintiffs alleged other causes of action against Hennessy, including false representation and civil battery. Because plaintiffs do not claim the trial court erred in granting judgment on the pleadings on those causes of action, we assume plaintiffs have abandoned them. (*Hood v. Compton Community College Dist.* (2005) 127 Cal.App.4th 954, 958, fn. 2 [26 Cal.Rptr.3d 180].) We therefore address only the issues of negligence and strict liability.

*Campbell-Hausfeld/Scott Fetzger Co.* (2004) 129 Cal.App.4th 577 [28 Cal.Rptr.3d 744] (*Tellez-Cordova*). Plaintiffs asserted that Hennessy's abrasive power tools, when used as intended and directed, released asbestos into the air around the users of Hennessy's brake grinding machines. Thus, plaintiffs argued, in their cases, as in *Tellez-Cordova*, it was the action of defendant's product that created the hazardous condition leading to plaintiffs' injuries, even if the injury-producing toxin did not originate from Hennessy's machines. (See *id.* at p. 585.) They also noted that their complaints alleged both negligence and strict liability theories of design defect, two bases of liability we did not address in *Taylor*. (See *Taylor, supra*, 171 Cal.App.4th at p. 572, fn. 4.)

After hearings on Hennessy's motions in all of these cases, the trial court granted judgment on the pleadings to Hennessy with respect to all of plaintiffs' causes of action. The trial court explained its reasoning in its tentative ruling. Citing *Taylor* and the line of California authority upon which *Taylor* relied, the trial court reasoned that "[a] product manufacturer has no duty to persons whose injury results from defects in the products of others." It noted plaintiffs did not allege that Hennessy sold an asbestos-containing product or that it had any control over the design and manufacture of the asbestos-containing brake linings used in conjunction with its machines. The trial court found *Tellez-Cordova* distinguishable on its facts and explained that unlike in *Tellez-Cordova*, plaintiffs made no allegation that Hennessy's machines could only function in conjunction with asbestos-containing brake linings, or that the brake arcing machines and brake linings formed a single defective system over which defendant exercised significant control. The trial court recognized that "the plaintiff's injury would not have occurred but for [Hennessy's] product, but it was a defect in the product of another which proximately caused the injury. The only alleged defect in [Hennessy's] machines is that they . . . caused another defective product to injure the decedent . . . ." Under those facts, the court ruled Hennessy had no duty to plaintiffs. It also denied plaintiffs' request for leave to amend their complaint.

The trial court entered judgment in Hennessy's favor on all of plaintiffs' causes of action. Plaintiffs filed timely appeals.[6]

### DISCUSSION

Plaintiffs contend their proposed amended complaints sufficiently allege causes of action for strict liability and negligence, and therefore the trial court

---

[6] After briefing in these appeals was completed, the California Supreme Court issued its opinion in *O'Neil v. Crane Co.* (2012) 53 Cal.4th 335 [135 Cal.Rptr.3d 288, 266 P.3d 987] (*O'Neil*), a case we discuss in greater detail below. On our own motion, we ordered these appeals consolidated and directed the parties to submit supplemental briefs on the effect of *O'Neil* on the issues in this case. Both plaintiffs and Hennessy filed supplemental briefs.

erred in granting judgment on the pleadings. Their theory is that by grinding the asbestos-containing brake linings, Hennessy's machines caused the release of respirable asbestos fibers into the air, fibers that had been safely attached within the matrix of the brake linings until subjected to the action of Hennessy's machines. Thus, according to plaintiffs, Hennessy's product created the risk of exposure to asbestos and caused the injuries alleged in their complaints. For this reason, plaintiffs contend their case fits within the mold of *Tellez-Cordova, supra,* 129 Cal.App.4th 577, because they have alleged the brake linings "were not dangerous without the power of [Hennessy's] tools." (*Id.* at p. 585.)

Hennessy's response is twofold. First, reprising the argument it made below, it claims it is not liable in either strict liability or negligence for injuries caused by other manufacturers' products. Second, it contends that as a matter of law, its products did not cause plaintiffs' injuries.

## I. Standard of Review

A motion for judgment on the pleadings is analogous to a general demurrer. (*Ludgate, supra,* 82 Cal.App.4th at p. 602.) Like a general demurrer, it tests the sufficiency of the complaint. (*108 Holdings, Ltd. v. City of Rohnert Park* (2006) 136 Cal.App.4th 186, 193 [38 Cal.Rptr.3d 589].) The scope of our review of a judgment on the pleadings is de novo, and we determine whether the complaint states a valid cause of action. (*Ludgate,* at p. 602.) In so doing, we accept as true the factual allegations the plaintiff makes and give them a liberal construction.[7] (*Gerawan Farming, Inc. v. Lyons, supra,* 24 Cal.4th at pp. 515–516.) On the other hand, we do not consider "conclusions of fact or law, opinions, speculation, or allegations contrary to law or judicially noticed facts." (*Shea Homes Limited Partnership v. County of Alameda* (2003) 110 Cal.App.4th 1246, 1254 [2 Cal.Rptr.3d 739].)

If the facts alleged in the complaint do not support any valid cause of action against a defendant, we then ask whether the complaint could reasonably be amended to do so. (*Kempton v. City of Los Angeles, supra,* 165 Cal.App.4th at p. 1347.) Leave to amend is liberally allowed. (*Id.* at p. 1348.) The trial court's denial of leave to amend is reviewed for abuse of discretion. (*Ludgate, supra,* 82 Cal.App.4th at p. 602.) The trial court abuses its discretion if it denies leave to amend when there is a reasonable possibility the defect in the pleading could be cured by amendment. (*Mendoza v. Continental Sales Co.* (2006) 140 Cal.App.4th 1395, 1402 [45 Cal.Rptr.3d 525].)

---

[7] "While we accept appellants' allegations as true for purposes of this appeal, nothing in this opinion should be construed as proven fact for purposes of later proceedings." (*Kempton v. City of Los Angeles* (2008) 165 Cal.App.4th 1344, 1347, fn. 1 [81 Cal.Rptr.3d 852].)

## II. *Relevant Case Law*

Resolution of these appeals turns largely on the application of existing case law to the allegations of plaintiffs' complaints. The issue is whether the cases before us are more closely analogous to *Tellez-Cordova*, as plaintiffs argue, or to *Taylor*, as Hennessy argues. We conclude the Supreme Court's opinion in *O'Neil* is dispositive of this issue. Like our colleagues in Division One, we hold that plaintiffs' "allegations satisfy the circumscribed parameters of liability articulated by the Court of Appeal in *Tellez-Cordova* and approved by the Supreme Court in *O'Neil*." (*Shields, supra,* 205 Cal.App.4th 782, 798.) We briefly review the facts and holdings of *Tellez-Cordova, Taylor,* and *O'Neil* before explaining their implications for these appeals.

### A. *Tellez-Cordova*

*O'Neil* provides a succinct summary of the facts of *Tellez-Cordova*: "Tellez-Cordova developed lung disease from breathing toxic substances released from metals he cut and sanded and from abrasive discs on the power tools he used. (*Tellez-Cordova, supra,* 129 Cal.App.4th at p. 579.) He sued manufacturers of these tools, arguing they were 'specifically designed' to be used with abrasive discs for grinding and sanding metals, and it was therefore reasonably foreseeable that toxic dust would be released into the air when the tools were used for their intended purpose. (*Id.* at p. 580.) Relying on *Garman v. Magic Chef, Inc.* [(1981)] 117 Cal.App.3d 634 [173 Cal.Rptr. 20], and *Powell v. Standard Brands Paint Co.* [(1985)] 166 Cal.App.3d 357 [212 Cal.Rptr. 395], the tool manufacturers argued California law imposed no duty on them to warn of hazards in the product of another. (*Tellez-Cordova,* at p. 585.) The tools themselves released no hazardous dust; the dust came from the abrasive discs that were attached to the tools and the metals they contacted. However, the Court of Appeal remarked that this argument 'misse[d] the point,' because the intended purpose of the tools was to abrade surfaces, and toxic dust was a foreseeable byproduct of this activity. According to the complaint's allegations, 'the tools had no function without the abrasives which disintegrated into toxic dust,' and 'the abrasive products were not dangerous without the power of the tools.' (*Ibid.*)" (*O'Neil, supra,* 53 Cal.4th at p. 360.)

In *Tellez-Cordova*, the trial court sustained the defendant manufacturers' demurrer to the plaintiffs' complaint for failure to state a cause of action, but the Court of Appeal reversed, holding that none of the defendant manufacturers' theories supported judgment on a demurrer. (*Tellez-Cordova, supra,* 129 Cal.App.4th at pp. 579, 581.) It rejected the defendant manufacturers' argument that they need not warn of defects in the products of another. (*Id.* at p. 585.) It explained, " '[A] manufacturer owes a foreseeable user of *its*

*product* a duty to warn of risks of using the product.' [Citation.] That is what appellants have alleged here." (*Ibid.*, italics added.) Put another way, *Tellez-Cordova* held that the defendant manufacturers were not being asked to warn of the risks arising exclusively from other manufacturers' products. Instead, the plaintiffs sought to hold the defendants liable for failure to warn of risks created by the use of the defendants' own products.

The defendant manufacturers also contended the complaint failed to meet the requirements of *Bockrath v. Aldrich Chemical Co.* (1999) 21 Cal.4th 71 [86 Cal.Rptr.2d 846, 980 P.2d 398] (*Bockrath*), "which set out the rules for pleading causation in 'a complaint alleging harmful long-term exposure to multiple toxins.' " (*Tellez-Cordova, supra*, 129 Cal.App.4th at p. 586, quoting *Bockrath, supra*, 21 Cal.4th at p. 77.) The manufacturers argued *Bockrath*'s requirements were not met because the complaint did not allege the defendants manufactured or supplied the toxins to which Tellez-Cordova was exposed. (*Tellez-Cordova*, at p. 586.) Again, the Court of Appeal disagreed, finding *Bockrath* inapplicable. (*Ibid.*) It explained that *Bockrath* set forth the pleading requirements when suppliers of toxic substances are sued. (*Ibid.*) It noted the plaintiffs had sued "under a different kind of theory, that respondents' tools, when used as intended, caused toxic particles to be released from the otherwise harmless wheels and discs." (*Ibid.*) The plaintiffs' theory was that the defendant manufacturers' products, "when used as intended—indeed, when used in the only way they could be used—did cause the injury, and they pled facts in support of that theory." (*Id.* at p. 587.) On demurrer, the court could not say as a matter of law that the products did not cause the injury alleged. (*Ibid.*)

B. *Taylor*

Reginald Taylor served aboard a Navy aircraft carrier for over three years in the mid-1960's, and during his service he removed and replaced asbestos-containing internal gaskets, packing, and insulation from equipment the defendant manufacturers had supplied to the Navy when the carrier was built in the early 1940's. (*Taylor, supra*, 171 Cal.App.4th at pp. 571–572.) Removal of these materials released into the air asbestos dust and particles, which Taylor inhaled. (*Id.* at p. 572.) Although some of the defendants' equipment included asbestos-containing parts when delivered to the Navy in the 1940's, it was undisputed that all of those original parts had been removed by the time of Taylor's service. (*Id.* at pp. 570–571 & fn. 2, 572.)

Taylor developed mesothelioma from his exposure to asbestos, and after his death, his wife sued the equipment manufacturers. (*Taylor, supra*, 171 Cal.App.4th at p. 572.) The manufacturers moved for summary judgment, arguing they were not liable because they did not manufacture or supply the

asbestos-containing materials to which Taylor had been exposed during his service in the Navy. (*Ibid.*) In opposing summary judgment, Mrs. Taylor argued that a " 'manufacturer has a duty to warn of hazards arising from the foreseeable uses of its product, even if that hazard arises from the addition of a product that, although manufactured by another, is used in the normal and intended operation of the defendant's product.' " (*Id.* at pp. 572–573.) After the trial court granted the manufacturers' motions for summary judgment, Mrs. Taylor appealed. (*Id.* at pp. 573–574.)

We held the equipment manufacturers could not be held strictly liable for failing to warn about the dangers of asbestos exposure arising from products manufactured and supplied by others.[8] (*Taylor, supra*, 171 Cal.App.4th at p. 575.) We explained first that "California law restricts the duty to warn to entities in the chain of distribution of the defective product." (*Ibid.*) Because the defendant manufacturers were not part of the chain of distribution of the asbestos-containing products to which the decedent had been exposed, they were not strictly liable for failing to warn of the dangers inherent in those products. (*Id.* at p. 579.) Second, after surveying analogous California failure to warn cases, we concluded that "California case law has not imposed on manufacturers a duty to warn about the dangerous propensities of other manufacturers' products . . . *unless the manufacturer's product in some way causes or creates the risk of harm . . . .*" (*Id.* at p. 583, italics added.) Third, we determined that the component parts doctrine shielded the manufacturers from liability. (*Id.* at p. 585, fn. omitted.)

 In the course of our discussion, we distinguished the case before us from *Tellez-Cordova*. (*Taylor, supra*, 171 Cal.App.4th at pp. 586–588.) We explained that, unlike the facts of *Taylor*, "in *Tellez-Cordova*, the plaintiff alleged that it was the action of *respondents' tools themselves* that created the injury-causing dust." (*Id.* at p. 587.) Thus, properly understood, *"Tellez-Cordova* is . . . not a case in which the defendants had a duty to warn *solely* of the hazards of other manufacturers' products." (*Id.* at p. 588.) Instead, in that case "a defect in the defendant manufacturer's product itself caused or created the risk of harm . . . ." (*Id.* at p. 586.) *Tellez-Cordova* therefore fell within the rule, articulated earlier in our opinion, that "a manufacturer *may* owe a duty to warn when the use of its product in combination with the product of another creates a potential hazard, [but] that duty arises *only* when the manufacturer's own product causes or creates the risk of harm." (*Id.* at p. 580.)

---

[8] The only theory of liability before us in *Taylor* was failure to warn, under both strict products liability and negligence. (*Taylor, supra*, 171 Cal.App.4th at pp. 572, fn. 4, 577.)

### C. *O'Neil*

In *O'Neil*, the California Supreme Court held the defendant product manufacturers could not be held liable, in either strict products liability or negligence, for injuries caused by adjacent products or replacement parts made by others and used in conjunction with the defendants' products. (*O'Neil, supra,* 53 Cal.4th at p. 342.) Like certain defendants in *Taylor,* the defendants in *O'Neil* had manufactured valves and pumps for the United States Navy during World War II. (*Id.* at pp. 343–344.) The valves and pumps were used with asbestos-containing external insulation and internal gaskets and packing, which were made by third parties and added to the pumps and valves after their sale to the Navy. (*Id.* at pp. 344–345.) Plaintiff O'Neil, a Navy seaman who had served aboard an aircraft carrier in the mid-1960's, was exposed to airborne asbestos fibers during the repair of equipment in the carrier's engine and boiler rooms, because this work "generated large amounts of asbestos dust." (*Id.* at p. 345.) There was no evidence, however, that any of the asbestos-containing dust came from the defendants' products. (*Ibid.*) The defendants had not manufactured or sold the external insulation or gaskets removed during the repair work, and although the valves and pumps contained internal asbestos-containing gaskets and packing when the aircraft carrier was built, those original components had been replaced long before O'Neil's service on the ship. (*Ibid.*)

On these facts, the Supreme Court held the defendants were not strictly liable for O'Neil's injuries "because (a) any design defect in *defendants' products* was not a legal cause of injury to O'Neil, and (b) defendants had no duty to warn of risks arising from *other manufacturers'* products." (*O'Neil, supra,* 53 Cal.4th at p. 348.) Discussing the design defect theory, the court concluded that even if the inclusion of asbestos makes a product defective, "no defect inherent in defendants' pump and valve products caused O'Neil's disease." (*Id.* at p. 350.) There was no evidence that the design of the defendants' products required the use of asbestos components, and they were not rendered defective merely because they were compatible for use with asbestos-containing components. (*Ibid.*)

The court went on to hold that the defendants had no duty to warn of hazards arising exclusively from other manufacturers' products. (*O'Neil, supra,* 53 Cal.4th at pp. 351–352.) After reviewing both our opinion in *Taylor* and out-of-state authorities addressing the question of the duty to warn in the asbestos context, the Supreme Court held that "where the hazard arises entirely from another product, and the defendant's product does not create or contribute to that hazard, liability is not appropriate." (*Id.* at pp. 361–362.) Summarizing its conclusions on the duty to warn, the *O'Neil* court stated: "We reaffirm that a product manufacturer generally may not be held strictly

liable for harm caused by another manufacturer's product. The only exceptions to this rule arise when the defendant bears some direct responsibility for the harm, either because the defendant's own product contributed substantially to the harm (see *Tellez-Cordova, supra*, 129 Cal.App.4th at p. 585), or because the defendant participated substantially in creating a harmful combined use of the products [citation]." (*O'Neil, supra*, 53 Cal.4th at p. 362.)

In the course of its discussion of the duty to warn, the Supreme Court examined *Tellez-Cordova, supra*, 129 Cal.App.4th 577. (*O'Neil, supra*, 53 Cal.4th at pp. 360–361.) It distinguished *Tellez-Cordova* from the case before it on two grounds. "First, the power tools in *Tellez-Cordova* could *only* be used in a potentially injury-producing manner. Their sole purpose was to grind metals in a process that inevitably produced harmful dust." (*Id.* at p. 361.) "Second, it was the action of the power tools in *Tellez-Cordova* that *caused* the release of harmful dust, even though the dust itself emanated from another substance." (*Ibid.*) The Supreme Court explained that the dust to which O'Neil was exposed came from insulation, gaskets, and packing made by others, and unlike the manufacturers in *Tellez-Cordova*, "[n]othing about defendants' pumps and valves caused or contributed to the release of this dust." (*Ibid.*) The Supreme Court went on to note that "[r]ecognizing a duty to warn was appropriate in *Tellez-Cordova* because there the defendant's product was intended to be used with another product *for the very activity that created a hazardous situation.*" (*Ibid.*)

Thus, although the Supreme Court refused to extend the holding of *Tellez-Cordova* "beyond its unique factual context," it used that case as an example of the exception to the rule "that a product manufacturer generally may not be held strictly liable for harm caused by another manufacturer's product." (*O'Neil, supra*, 53 Cal.4th at pp. 361, 362.) Under the holding of *O'Neil*, a manufacturer may be held strictly liable for harm caused by the product of another "when the defendant bears some direct responsibility for the harm, . . . because the defendant's own product contributed substantially to the harm." (*Id.* at p. 362.)

III. *Plaintiffs' Proposed Amended Complaints State Causes of Action for Strict Liability and Negligence.*

Reviewing the allegations of plaintiffs' complaints in the context of the legal rules enunciated in *O'Neil*, *Taylor*, and *Tellez-Cordova*, we conclude that if plaintiffs were permitted to amend their complaints in the manner proposed, their amended complaints would allege facts sufficient to state causes of action for strict liability and negligence. Since the claimed defect in the pleadings can be cured by amendment, the trial court abused its discretion in denying plaintiffs leave to amend. (*Mendoza v. Continental Sales Co., supra*, 140 Cal.App.4th at p. 1402.)

## A. *Strict Liability*

■ To summarize, plaintiffs allege Hennessy manufactured and distributed brakeshoe grinding machines, the sole and intended purpose of which was to grind asbestos-containing brake linings. At the time in question, all brakeshoe linings used on automobiles and trucks in the United States contained asbestos, and it was not only foreseeable that Hennessy's machines would be used to grind such linings, this was their inevitable use. The asbestos fiber bundles were physically bound in a matrix in the nonfriable linings, and only when subjected to the action of Hennessy's machines were the fibers released into the air where they posed a danger to those exposed. Thus, when used as designed and intended, Hennessy's machines caused the release of the toxic agent that injured plaintiffs, although that agent did not emanate from Hennessy's machines.

We find these allegations indistinguishable from those *Tellez-Cordova* held sufficient to survive demurrer. As in that case, plaintiffs allege Hennessy's machines created harmful dust, even if the dust did not come from the machines themselves. (*Tellez-Cordova, supra,* 129 Cal.App.4th at p. 585.) Plaintiffs' theory is that Hennessy's machines caused harmful asbestos fibers to be released from brake linings that would have been harmless had they been left intact. (See *id.* at p. 586.) Here, as in *Tellez-Cordova*, plaintiffs allege the sole purpose of Hennessy's machines was to grind brake linings "in a process that inevitably produced harmful dust." (*O'Neil, supra,* 53 Cal.4th at p. 361.) Under the allegations of plaintiffs' complaints, which we must accept as true, Hennessy's "product was intended to be used with another product *for the very activity that created a hazardous situation.*" (*Ibid.*) While a manufacturer generally has no liability for harm caused by another manufacturer's product, *O'Neil* established two exceptions to that general rule, and these allegations bring plaintiffs' complaints within one of those exceptions. (*Id.* at p. 362.) Plaintiffs can state a cause of action for strict liability, as they claim Hennessy "bears some direct responsibility . . . because [Hennessy's] own product contributed substantially to the harm." (*Ibid.*; accord, *Shields, supra,* 205 Cal.App.4th 782, 796 [explaining that plaintiffs in these cases "allege that [Hennessy] manufactured and distributed a machine that did indeed create or contribute substantially to the exposure to airborne asbestos fibers suffered by plaintiffs"]; *Taylor, supra,* 171 Cal.App.4th at p. 583 [duty to warn may exist where "manufacturer's product in some way causes or creates the risk of harm . . ."].)

## B. *Negligence*

■ We reach the same conclusion with regard to plaintiffs' cause of action for negligence. Reviewing allegations very similar to those made in

our cases, *Tellez-Cordova* concluded the plaintiffs had stated a claim in negligence against the defendant tool manufacturers. (*Tellez-Cordova, supra,* 129 Cal.App.4th at pp. 579–580, 581.) There is no reason a different result should obtain here. The theories of negligence and strict liability "parallel and supplement each other" (*Jiminez v. Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 387 [93 Cal.Rptr. 769, 482 P.2d 681]), and the same policy considerations that militate for or against imposition of strict liability may apply with equal force in the context of negligence. (See *O'Neil, supra,* 53 Cal.4th at p. 366, citing *Taylor, supra,* 171 Cal.App.4th at p. 596.) Because plaintiffs state a cause of action for strict liability under the rules announced in *O'Neil,* we likewise find their allegations sufficient to state a cause of action for negligence.

■ Hennessy claims plaintiffs have no cause of action in negligence because no duty of care exists. In Hennessy's view, the foreseeability of the harm is insufficient to give rise to a duty of care, and policy reasons preclude imposition of such a duty. Initially, we question Hennessy's framing of this issue. Under established California law, a manufacturer *already* owes a duty of care to foreseeable users of its product. (See, e.g., *Pike v. Frank G. Hough Co.* (1970) 2 Cal.3d 465, 470 [85 Cal.Rptr. 629, 467 P.2d 229] [duty to design product so it is safe for intended use]; *Powell v. Standard Brands Paint Co.* (1985) 166 Cal.App.3d 357, 362 [212 Cal.Rptr. 395] [duty to warn of risks of using product].) "Because the general duty to take ordinary care in the conduct of one's activities (Civ. Code, § 1714, subd. (a)) indisputably applies" to product manufacturers, "the issue is . . . whether a categorical exception to that general rule should be made . . ." in these circumstances. (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 774 [122 Cal.Rptr.3d 313, 248 P.3d 1170].) Such an exemption is appropriate "only when foreseeability and policy considerations justify a categorical no-duty rule . . . ." (*Id.* at p. 772.)

The policy considerations and foreseeability issues Hennessy cites are inapposite if we accept, as we must, the truth of the allegations in plaintiffs' proposed amended complaints. Contrary to Hennessy's claims, holding that plaintiffs' complaints state a cause of action for negligence will not render Hennessy potentially liable for defective products made or supplied by others. Hennessy is not being asked to "insure against products over which [it has] no control." As explained above, plaintiffs seek to hold Hennessy liable for design and warning defects in Hennessy's own product, not the products of others. Furthermore, the alleged injuries were not unforeseeable merely because Hennessy's brakeshoe grinding machines did not themselves contain asbestos. Plaintiffs allege that Hennessy knew or should have known its machines would be used to grind asbestos-containing brake linings and that

this was the sole, intended, and inevitable use of the machines.[9] Hennessy's supplemental brief even concedes it "designed [m]achines that could foreseeably be used with asbestos-containing products." On the facts plaintiffs allege, Hennessy has failed to justify imposition of a categorical no-duty rule. (See *Cabral v. Ralphs Grocery Co., supra*, 51 Cal.4th at p. 772.)

## IV. *Hennessy Fails to Distinguish* Tellez-Cordova.

Hennessy's attempt to distinguish *Tellez-Cordova* is unpersuasive.[10] Hennessy claims *Tellez-Cordova* involved a situation in which two products were combined into a single "ultimate 'finished product.' " (*Tellez-Cordova, supra*, 129 Cal.App.4th at p. 584.) In such cases, Hennessy argues, neither product functions on its own and is not independently harmful. "The combination of the two products, however, creates a harmful finished product for which a duty to warn may arise because there is no manufacturer of the complete product that can best regulate it."

■ At the outset, we note that the portion of the *Tellez-Cordova* opinion upon which Hennessy relies is the court's discussion of the component parts doctrine.[11] (*Tellez-Cordova, supra*, 129 Cal.App.4th at pp. 581–584.) But Hennessy has not claimed that doctrine applies here. In fact, at the hearing on its motion for judgment on the pleadings in the Bettencourt case, Hennessy's counsel stated, "We're not a component parts case. I'm not a component parts manufacturer defendant. This is a straight stream of commerce argument." Having expressly disavowed any reliance on the component parts doctrine, we fail to see how *Tellez-Cordova*'s discussion of it is relevant. Additionally, Hennessy has not explained why it should be considered a component parts manufacturer. To the contrary, it claims its product "is a complete and functioning machine, in and of itself." Assuming this is true, the component parts doctrine has no bearing here, since it applies to " ' "generic" or "off-the-shelf" components, as opposed to those which are " 'really a separate product with a specific purpose and use.' " [Citation.]' " (*Id.* at p. 582.)

---

[9] These allegations distinguish this case from *Taylor*. In that case, we expressed doubt that a manufacturer could "reasonably be expected to foresee the risk of latent disease arising from products supplied by others that may be used with the manufacturer's product years or decades after the product leaves the manufacturer's control." (*Taylor, supra*, 171 Cal.App.4th at p. 594.) Here, the allegations are that grinding asbestos-containing brake linings was the sole intended use of Hennessy's product and that when used as designed, the machines caused the release of harmful asbestos. Plaintiffs allege the risk was created by Hennessy's own product when that product was used not only in a foreseeable manner, but exactly as intended.

[10] Hennessy seeks only to distinguish *Tellez-Cordova*; it does not contend that case was incorrectly decided.

[11] Under the component parts doctrine, " 'the manufacturer of a product component or ingredient is not liable for injuries caused by the finished product unless it appears that the component itself was "defective" when it left the manufacturer. [Citation.]' " (*Tellez-Cordova, supra*, 129 Cal.App.4th at p. 581.)

Moreover, Hennessy misstates the facts of *Tellez-Cordova*. It claims the injuries alleged in that case were caused by the combination of a grinder with certain grinding wheels and discs, because "[c]hemicals released *from these discs* caused the plaintiffs' injury." (Italics added.) This is inaccurate. The complaint in *Tellez-Cordova* alleged the injury was caused by the creation of "respirable metallic dust *from the metal being ground* and from the abrasive wheels and discs . . . ." (*Tellez-Cordova, supra,* 129 Cal.App.4th at p. 580, italics added; see also *O'Neil, supra,* 53 Cal.4th at p. 360 ["The tools [in *Tellez-Cordova*] themselves released no hazardous dust; the dust came from the abrasive discs that were attached to the tools *and the metals they contacted.*" (italics added)].) As the court described the complaint, "the discs and wheels do not create respirable metallic dust unless they are used with respondents' power tools, because it is the speed and force of those tools which cause the dust to become airborne." (*Tellez-Cordova,* at p. 580.) Similarly, in the cases before us, plaintiffs allege it is the action of Hennessy's machines that causes the release of harmful asbestos fibers.

Hennessy's supplemental brief further illustrates its misunderstanding of *Tellez-Cordova*'s holding. Hennessy correctly states that *O'Neil* recognized two exceptions to the general rule that a manufacturer is not strictly liable for harm caused by the products of others. (See *O'Neil, supra,* 53 Cal.4th at p. 362.) *O'Neil* cited *Tellez-Cordova* as supporting an exception to the general rule when "the defendant's own product contributed substantially to the harm . . . ." (*Ibid.*) But Hennessy contends this exception applies when "defendant's product unites with another to form one finished product that creates a unique risk of harm . . . ."[12] This formulation is simply inconsistent with the language of *O'Neil.* The Supreme Court characterized *Tellez-Cordova* as "arguably an example of a 'case where the combination of one sound product with another sound product creates a dangerous condition about which the manufacturer of each product has a duty to warn [citation].' [Citation.]" (*O'Neil,* at p. 361.) The high court said nothing about the two products uniting to form a single finished product.

---

[12] At oral argument, Hennessy's counsel elaborated on his interpretation of *Tellez-Cordova,* asserting that it was a case in which the harm arose from the uniting of two products. He went on to argue that *O'Neil* limits *Tellez-Cordova* to its facts and holds that where separate and distinct products are expected to be used together, there can be no liability as a matter of law. This misreads *O'Neil.* While "California law does not impose a duty to warn about dangers arising entirely from another manufacturer's product, even if it is foreseeable that the products will be used together," *O'Neil* approved *Tellez-Cordova*'s imposition of a duty to warn "because there the defendant's product was intended to be used with another product *for the very activity that created a hazardous situation.*" (*O'Neil, supra,* 53 Cal.4th at p. 361.) Here, plaintiffs allege that the sole, intended, and inevitable use of Hennessy's product causes the release of harmful asbestos fibers. Thus, they claim "the intended use of [Hennessy's] product inevitably creates a hazardous situation . . . ," and thus "it is reasonable to expect [Hennessy] to give warnings." (*Ibid.*)

V. *Hennessy's Asserted Defenses to Liability Are Unconvincing.*

Despite *O'Neil*'s recognition that a product manufacturer may be liable for harm caused by the product of another where the defendant's product contributes substantially to the harm (*O'Neil, supra,* 53 Cal.4th at p. 362), Hennessy continues to argue it can have no liability because it is outside the chain of distribution of the allegedly defective product—the asbestos-containing brake linings. It also insists its product was not a cause of plaintiffs' injuries. We reject both arguments.

A. *The "Stream of Commerce" Defense Is Inapplicable.*

Hennessy argues it is not liable as a matter of law for damage caused by the asbestos-containing brake linings because it did not place the brake linings into the stream of commerce. (See *Taylor, supra,* 171 Cal.App.4th at pp. 575–576 [explaining stream of commerce theory of products liability].) Hennessy claims plaintiffs have not alleged it was part of the "chain of distribution of the injury-causing manufactured product" (*id.* at p. 575) or "a part of the manufacturing or marketing enterprise of the allegedly defective product that caused the injury in question" (*Peterson v. Superior Court* (1995) 10 Cal.4th 1185, 1188 [43 Cal.Rptr.2d 836, 899 P.2d 905]), and therefore it is not liable to plaintiffs under either a strict products liability or a negligence theory. We disagree.

First, the unspoken premise of Hennessy's argument is that the asbestos-containing brake linings were the sole cause of plaintiffs' injuries. This argument is therefore based on a factual assumption inconsistent with the allegations of the complaints. Plaintiffs do not allege that the asbestos-containing brake linings were the *sole* cause of their injuries. Instead, they allege that the action of Hennessy's machines caused asbestos fibers that had been safely bound in the matrix of the brake linings to be released into the air, and this release resulted in the harmful asbestos exposure. Plaintiffs further claim the machines were specifically designed to grind such brake linings and that this was the "intended and only use" or the " 'inevitable use' " of Hennessy's machines. Thus, Hennessy's argument "misses the point of appellants' complaint," which is that *Hennessy's tools* created the airborne asbestos fibers, "even if the [fibers] did not come directly from the tools." (*Tellez-Cordova, supra,* 129 Cal.App.4th at p. 585.)

That Hennessy did not manufacture or distribute the asbestos-containing brake linings does not absolve it of liability as a matter of law. As our Supreme Court explained, "a product manufacturer generally may not be held strictly liable for harm caused by another manufacturer's product" (*O'Neil, supra,* 53 Cal.4th at p. 362), but this is true only "where the hazard arises

*entirely from another product*, and the defendant's product *does not create or contribute to that hazard*" (*id.* at p. 361, italics added). Plaintiffs' claim is that Hennessy's "product was intended to be used with another product *for the very activity that created a hazardous situation.*" (*Ibid.*) Plaintiffs' claims therefore fall within the exception to the general rule that a manufacturer may not be held strictly liable for harm caused by another manufacturer's product, because here the allegation is that Hennessy's own product contributed substantially to the harm. (*Id.* at p. 362.)

For similar reasons, we reject Hennessy's argument that it had no duty to warn of dangers associated with the asbestos-containing brake linings. Citing *Taylor*, Hennessy contends its duty is restricted to warnings based on the characteristics of its brake grinding machine. Once again, we disagree.

█ In *Taylor* we recognized the general rule that California law does not require manufacturers to warn of defects in other manufacturers' products. (*Taylor, supra*, 171 Cal.App.4th at pp. 579–583.) While we concluded the respondent manufacturers owed no duty to warn in that case, we acknowledged "a manufacturer *may* owe a duty to warn when the use of its product in combination with the product of another creates a potential hazard, [but] that duty arises *only* when the manufacturer's own product causes or creates the risk of harm." (*Id.* at p. 580.) The Supreme Court reached a similar conclusion in *O'Neil*. After reviewing the facts and holding of *Tellez-Cordova*, the high court agreed that recognizing a duty to warn was appropriate in that case "because there the defendant's product was intended to be used with another product *for the very activity that created a hazardous situation*. Where the intended use of a product inevitably creates a hazardous situation, it is reasonable to expect the manufacturer to give warnings." (*O'Neil, supra*, 53 Cal.4th at p. 361.)

In this case, plaintiffs allege Hennessy's product (the brakeshoe grinding machine) was intended to be used with another product (the asbestos-containing brake linings) for an activity that created a hazardous situation (the release of asbestos fibers). This is the exact circumstance in which the Supreme Court found it reasonable to expect a manufacturer to give warnings. (*O'Neil, supra*, 53 Cal.4th at p. 361.) Plaintiffs do not seek to require Hennessy to warn of defects in another manufacturer's products; they allege instead that Hennessy owed a duty to warn foreseeable users of its brake grinding machines of the risks of using the product. (See *Tellez-Cordova, supra*, 129 Cal.App.4th at p. 585.)

B. *Plaintiffs Sufficiently Allege Causation.*

Hennessy makes two arguments on the issue of causation. Both depend on factual assertions inconsistent with the allegations of the plaintiffs' proposed

amended complaints. As such, they have no relevance at the pleading stage. (See *Tellez-Cordova, supra*, 129 Cal.App.4th at p. 582 [facts that contradict allegations of complaint have no relevance on demurrer].) In addition, Hennessy's arguments are based on a misunderstanding of the law of causation in asbestos cases.

Hennessy summarizes its first causation argument as follows: "Appellants have not alleged and cannot allege Hennessy's brake arcing machine was a substantial factor in causing their harm because they alleged the same harm—exposure to inherently dangerous asbestos containing brake linings—occurred without the use of Hennessy's brake arcing machine."[13] We cannot agree.

■ Whether a defendant's product was the legal cause of a plaintiff's injury is generally a question of fact for the jury, unless, as a matter of law, the facts admit of only one conclusion. (See *Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 694 [11 Cal.Rptr.3d 807].) "In the context of products liability actions, the plaintiff must prove that the defective products supplied by the defendant were a substantial factor in bringing about his or her injury." (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 968 [67 Cal.Rptr.2d 16, 941 P.2d 1203] (*Rutherford*).) In products liability suits involving injuries from asbestos exposure, many defendants may share liability. (See *id.* at p. 962 [asbestos manufacturer and decedent's employers all assessed proportionate share of fault for decedent's injuries].) As the California Supreme Court explained in *Bockrath, supra*, 21 Cal.4th at page 79: " 'The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical.' (*Rutherford, supra*, 16 Cal.4th at p. 978.) Thus, 'a force which plays only an "infinitesimal" or "theoretical" part in bringing about injury, damage, or loss is not a substantial factor' (*id.* at p. 969), but a very minor force that does cause harm is a substantial factor (*ibid.*). This rule honors the principle of comparative fault. (*Ibid.*)"

That the conduct of other entities may also have contributed to plaintiffs' injuries would not preclude a finding that Hennessy's product was a substantial factor in causing those injuries. (See, e.g., *Taylor v. John Crane, Inc.* (2003) 113 Cal.App.4th 1063, 1071 [6 Cal.Rptr.3d 695] [fault for plaintiff's

---

[13] For example, at oral argument, Hennessy's counsel pointed to plaintiffs' allegations that the brake linings were also abraded with sandpaper, and he contended the same exposure to asbestos fibers would have occurred from the use of sandpaper. The obvious distinction between sandpaper and Hennessy's brake arcing machine is that sandpaper has a wide variety of uses. In contrast, plaintiffs' complaints allege that the sole, intended, and inevitable use of Hennessy's machines is to grind asbestos-containing brake linings in a manner that releases airborne asbestos particles. (See *Shields, supra*, 205 Cal.App.4th 782, 787 [distinguishing Hennessy's machines from a cigarette lighter].)

asbestos-related injuries properly allocated to both manufacturer of asbestos-containing products and to Navy as plaintiff's former employer].) The Judicial Council of California Civil Jury Instructions (CACI), upon which Hennessy relies, expressly recognize this principle. They state that a defendant "cannot avoid responsibility just because some other person, condition, or event was also a substantial factor in causing [. . . plaintiff]'s harm." (Judicial Council of Cal., Civ. Jury Instns. (2012) CACI No. 431, italics omitted.) Thus, even if Hennessy's machines were only "a very minor force" that caused harm to plaintiffs, and even if other persons or entities also contributed to the harm, Hennessy's product could still be found to be a substantial factor in bringing about plaintiffs' injuries. (*Bockrath, supra*, 21 Cal.4th at p. 79.)

Hennessy also contends that "[a]s a matter of law, in asbestos litigation, asbestos is the defective product that creates the risk of harm because asbestos is inherently dangerous." The principal flaw in this argument is that it is inconsistent with the allegations of plaintiffs' proposed amendments to their complaint.[14] The amended language states: "Until subjected to defendants' products, asbestos fiber bundles were physically bound or otherwise attached in a matrix in the nonfriable asbestos brake lining." Plaintiffs further allege that Hennessy's machines caused the release of asbestos fibers from the brake linings, resulting in injury from exposure to airborne asbestos. Thus, contrary to Hennessy's claims, the allegations make clear the brake linings were nonfriable in their intact state and did not pose a danger until asbestos fibers were released by the action of Hennessy's machines. Once again, plaintiffs' theory is that Hennessy's "products, when used as intended—indeed, when used in the only way they could be used—did cause the injury, and they pled facts in support of that theory. We cannot say . . . that [Hennessy's] products did not, as a matter of law, cause the injury alleged." (*Tellez-Cordova, supra*, 129 Cal.App.4th at p. 587.)

Hennessy's contention that the same injury would have occurred regardless of whether its product was used is likewise inconsistent with the allegations before us. Hennessy contends "[a] product does not create the risk of harm if the same harm would have occurred without the use of the defendant's product." As explained above, however, plaintiffs allege that at least some of the asbestos exposure they suffered occurred only because the action of Hennessy's machines caused asbestos fibers that were "physically bound or

---

[14] In addition, Hennessy's argument conflicts with applicable case law. "Asbestos-containing products are not dangerous when intact. The health hazard arises when the products are cut or damaged, releasing asbestos fibers that can be inhaled." (*O'Neil, supra*, 53 Cal.4th at p. 345; see also *Taylor, supra*, 171 Cal.App.4th at p. 587 [decedent's injuries caused "by the release of asbestos"]; *San Francisco Unified School Dist. v. W.R. Grace & Co.* (1995) 37 Cal.App.4th 1318, 1325 [44 Cal.Rptr.2d 305] ["The physical danger to persons . . . begins when asbestos fibers become airborne."].)

otherwise attached in a matrix in the nonfriable asbestos brake lining" to be released and made airborne. They further allege that the action of Hennessy's brakeshoe grinding machines themselves created the asbestos exposure and caused the "asbestos harm." The facts plaintiffs have pled, which we must accept as true, sufficiently allege causation. (See *Tellez-Cordova, supra,* 129 Cal.App.4th at pp. 586–587.)

## VI. *Conclusion*

We hold that the defect in plaintiffs' complaints could have been cured by amendment. Plaintiffs' complaints, if amended in the manner proposed, would sufficiently allege causes of action for strict products liability and negligence. The trial court therefore erred in denying leave to amend and in granting judgment on the pleadings on those causes of action.

### DISPOSITION

The judgment is reversed with respect to plaintiffs' causes of action for strict products liability and negligence. The judgment is affirmed as to all other causes of action. Costs to plaintiffs. (Cal. Rules of Court, rule 8.278(a)(3).)

Simons, J., and Bruiniers, J., concurred.