Filed 1/22/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| LAOSD ASBESTOS CASES. | |
| ANN PATRICE GIBBONS et al., | B288031 |
| Plaintiffs and Appellants, | JCCP No. 4674 (Los Angeles County Super. Ct. No. BC644854) |
| v. | |
| JOHNSON & JOHNSON CONSUMER INC., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Steven J. Kleifield, Judge.  Affirmed.

Waters, Kraus & Paul, Michael B. Gurien, for Plaintiffs and Appellants.

King and Spalding, Paul R. Johnson and Julie E. Romano; Orrick, Herrington & Sutcliffe, E. Joshua Rosenkranz, Naomi J. Scotten. Ethan P. Fallon and Robert M. Loeb for Defendant and Respondent

---

## INTRODUCTION

Plaintiffs and appellants Ann Patrice Gibbons and James Randall Gibbons (collectively, appellants) contend the Shower to Shower cosmetic powder and Johnson's Baby Powder Mrs. Gibbons used for two decades were contaminated with asbestos and a substantial factor in causing her mesothelioma. The products' manufacturer, defendant and respondent Johnson & Johnson Consumer Inc. (respondent or JJCI), moved for summary judgment on the basis of its expert's conclusion, "to a reasonable degree of scientific certainty," that JJCI's talcum powder and the talc from its source mines did not contain asbestos. Respondent contended appellants did not, and would not be able to, establish it was more likely than not the talc products Mrs. Gibbons used were tainted with asbestos.

Appellants did not present expert testimony to counter the opinion by respondent's expert. They did not offer verified admissions or interrogatory answers by respondent. Instead, they relied on their attorney's declaration that attached JJCI documents and deposition testimony by Mrs.

2

Gibbons and a JJCI employee who maintained JJCI never found asbestos in any of its talc products.

We have independently reviewed the record and hold summary judgment was properly granted in respondent's favor.

## FACTUAL AND PROCEDURAL BACKGROUND
### I
### *The Lawsuit*[1]

Mrs. Gibbons, born in 1962, used Shower to Shower daily and liberally for 20 years, from 1980 to 2000. She used Johnson's Baby Powder from 1983 to 1985 for her son's diaper changes. During the years Mrs. Gibbons used these products, respondent sourced all its talc from two Vermont mines -- Hammondsville and Argonaut.

Mrs. Gibbons's current and former spouses were all employed in the construction industry between 1981 and 2000. Their work allegedly exposed them and her to products containing asbestos. (See, e.g., *Kesner v. Superior Court* (2016) 1 Cal.5th 1132.)

Mrs. Gibbons was diagnosed with malignant mesothelioma in July 2016. She and her current spouse initiated this action in December 2016, alleging strict liability, negligence, false representation, intentional failure to warn/concealment, premises owner/contractor liability,

---

[1] This is one of the LAOSD Asbestos Cases (Judicial Council Coordination Proceeding (JCCP) No. 4674; Code Civ. Proc., § 404 et seq.) All undesignated statutory citations that follow refer to the Code of Civil Procedure.

and loss of consortium based on asbestos exposure. Appellants sought general and punitive damages against two groups of defendants: those that allegedly exposed Mrs. Gibbons and her family to asbestos through construction work[2] and the two entities involved in the manufacture and distribution of Shower to Shower and Johnson's Baby Powder -- JJCI and Imerys Talc America, Inc. (Imerys), a JJCI talc supplier. Against JJCI and Imerys, appellants alleged Shower to Shower and Johnson's Baby Powder were adulterated with asbestos.

## II
### *Summary Judgment Motion*
#### A. **Moving Papers**

JJCI and Imerys each moved for summary judgment/summary adjudication of issues.[3] Respondent argued appellants' formal discovery answers were "[f]actually [d]evoid" insofar as identifying "any specific facts that Mrs. Gibbons was actually exposed to asbestos from her

---

[2] The construction defendants, including the sole defendant named in the cause of action for premises liability, are not parties to this appeal.

[3] Imerys's motion for summary judgment was granted, and judgment was entered in its favor. Appellate proceedings against Imerys are currently stayed as a result of that party's bankruptcy status.

This opinion addresses issues raised as to JJCI only. Because we conclude JJCI's motion for summary judgment was properly granted, we do not analyze separately the summary adjudication issues.

4

alleged use of Johnson's Baby Powder and/or Shower to Shower." Respondent supported the summary judgment motion with a lengthy declaration from its designated expert, Matthew Sanchez, Ph.D.[4]

Appellants filed written objections to 27 of the 110 paragraphs in Sanchez's declaration. The trial court ruled on all objections, sustaining 12 and overruling 15. Appellants did not make any oral objections at the hearing.

Without objection, Sanchez offered the following evidence: He holds a Ph.D. in geology and is a member of several mineralogical and geological professional societies. As of October 2017, he was specializing "in characterizing asbestos in raw materials and in building products and the development of asbestos analytical methods." He also was active "on various committees regarding the analysis of talc and asbestos" and was a member of a professional group

---

[4] Respondent's attorney filed a separate declaration that attached several publications; the trial court sustained appellants' objections to those documents.

The trial court also sustained appellants' objections to excerpts from the deposition of John Hopkins, Ph.D., a former JJCI employee and respondent's designated "person most knowledgeable." Hopkins has been deposed in several other lawsuits in JCCP No. 4674. The trial court did not permit respondent to support its motion with any of Hopkins's deposition testimony.

However, the trial court permitted appellants to oppose JJCI's motion with excerpts from Hopkins's deposition testimony in a different asbestos lawsuit.

"currently drafting testing methods specific to cosmetic and pharmaceutical grade talcs" and had "published more than thirty publications, including on the identification, characterization, and quantification of asbestos."

In order to render opinions in this litigation, Sanchez drew on his "technical expertise and experience in analyzing a variety of materials, including talc, for asbestos content to review and interpret the available analytical testing data on JJCI's talcum powder and its source mines." He reviewed "various governmental and academic studies on talc" from the three mines JJCI used post-World War II to source its cosmetic/pharmaceutical grade talc. Sanchez also reviewed historical testing data from JJCI and the Federal Drug Administration (FDA).

Talc, a magnesium silicate, is identified as either "industrial grade [or] cosmetic/pharmaceutical grade, depending on the particular deposit from which it comes." Only about five percent of all commercially mined talc contains the purity, softness, and fine particle makeup to qualify as cosmetic/pharmaceutical grade. Industrial grade talc is less pure and contains "more accessory minerals, including up to 50 percent tremolite . . . ." Asbestos, when present in natural talc deposits, is an accessory mineral.

Like talc, asbestos is naturally occurring. "Asbestos is a collective term that describes . . . six . . . highly fibrous silicate minerals that . . . [¶] . . . when crystallized in a rare asbestiform habit, are regulated as asbestos . . . . There are two asbestos families: serpentine and amphibole.

Ninety-nine percent "of the known world occurrences" of serpentine and amphibole minerals crystallize in "common

non-asbestiform habits." Non-asbestiform minerals "are not regulated as asbestos." For example, the asbestiform serpentine mineral known as chrysotile is a regulated asbestos; the unregulated, non-asbestiform versions are antigorite or lizardite. Contributing some confusion on the topic, non-asbestiform tremolite is not a regulated mineral, but asbestiform tremolite, commonly referred to as tremolite asbestos, is.

Various tests are available to detect asbestos in talc. Typically, analysts employ a combination of tests to determine whether asbestos is present in bulk talc samples. The presence of "amphibole mineral in talc is not the same thing as reliably detecting asbestos in talc." Crushed non-asbestiform amphibole may result in "'cleavage fragments'" that mimic the appearance of individual asbestiform fibers. "In particular, anthophyllite [an amphibole mineral] is easily misidentified in talc."

Similar errors occur with the mineral in serpentine form: "Historically, cosmetic talcum powder has occasionally, but erroneously, been reported as a source of chrysotile asbestos. First, talc plates can roll up and appear tubular -- like chrysotile -- under an electron microscope. Such talc 'scrolls' often yield complex diffraction patterns that are atypical of talc, including 'streaking' like chrysotile. Second, many of these reports find only a single fiber or two of chrysotile, which is more indicative of laboratory contamination as opposed to asbestos contamination in the talcum powder itself."

Still without objection, Sanchez concluded, based on his "review and interpretation of [various governmental and

7

academic studies],” as well as his analysis of internal JJCI documents, that talc sourced from Vermont's Hammondsville and Argonaut mines was asbestos-free.[5] The expert explained that southern Vermont talc deposits were the result of “a geological condition not favorable for the formation of asbestos, but where non-asbestiform serpentine occurs. Several published studies found no asbestos in talc produced in this mining district [identifying studies], while to [his] knowledge no published study found asbestos. In fact, Vermont talc was chosen by [one study] to determine the health effect to miners and millers exposure to asbestos-free talc.”

Appellants' objections to paragraphs 9, 55, 59, and 110 of the Sanchez declaration were among those the trial court overruled. In paragraph 9, Sanchez stated that one requirement for cosmetic/pharmaceutical talc is that it contain no asbestos.

In paragraph 55 of his declaration, Sanchez noted he “evaluated the scientific literature related to the geology of the talc formations in southern Vermont” and concluded talc from that area was not contaminated with asbestos. He further opined in paragraph 59, “to a reasonable degree of scientific certainty that it appears very unlikely that

---

[5] For example, Sanchez stated, “by 1977, JJCI required that its talc suppliers analyze their talc for asbestos content and certify that any talc they supplied to JJCI was asbestos-free, as determined [by recognized testing methods].” “JJCI's Raw Material Purchase Specifications . . . confirm that suppliers were required to analyze each shipment of talc for asbestos content and certify that each shipment of talc was asbestos free.”

8

asbestos occurred in [the Vermont] talc deposits, or in turn in products produced from them. Also, . . . [he] found no asbestos minerals in talc ore from samples [another scientist] collected at [one of the Vermont mines]. It is also worth pointing out that many of the past testing documents need to be critically evaluated . . . and not taken at face value. Most certainly serpentine group minerals do occur in these deposits, but investigators mostly only reported finding the antigorite variety, as geological conditions did not favor the formation of chrysotile. The occurrence of amphiboles appears rare in the deposit, and there is no evidence that any amphiboles in the deposit, or the shist enclosing it, are asbestiform."

In paragraph 110, Sanchez concluded, "In my expert opinion, [respondent's] talcum powder and talc from the source mines was and is free of asbestos. This opinion is offered to a reasonable degree of scientific certainty. This opinion is based on my expertise, training, and experience in analyzing materials, including talc, for possible asbestos content. This opinion is supported by my own site visit and by my review, analysis, and interpretation of decades of study conducted by scientists in academia, federal government, and industry. This opinion is also supported by my review, analysis, and interpretation of the available analytical testing data on [respondent's] talcum powder and talc from its three source mines."

### B. *Appellants' Opposition*

In opposition, appellants argued the burden to produce evidence never shifted to them because their discovery

answers were sufficient, while Sanchez's declaration was not. Even if the burden shifted, appellants maintained their evidence demonstrated the Vermont mines were contaminated with asbestos and "asbestos was routinely found in testing of the finished [JJCI] products."

Appellants' opposition did not include verified admissions or interrogatory answers by respondent or judicially noticeable matters. (§ 437c, subd. (b)(2).) It was presented solely through the declaration of their counsel, Michael B. Gurien. Gurien identified and attached 91 exhibits, including extensive excerpts from Mrs. Gibbons's deposition in this case and Hopkins's deposition in another JCCP No. 4674 lawsuit (not the same deposition testimony JJCI sought to use; see fn. 4). Most of the remaining 700-plus pages of exhibits were documents JJCI produced in this and other lawsuits in JCCP No. 4674. The parties stipulated all bates-stamped exhibits submitted by appellants could be considered by the trial court.

The bates-stamped exhibits fell into two broad categories. The larger group included documents that were technical in nature, e.g., intra-company communications, tests, studies, and outside consultant reports. Many exhibits predated respondent's activities in the Hammondsville and Argonaut mines; some involved different mines on different continents. Many exhibits predated Mrs. Gibbons's use of respondent's talc products.[6]

---

[6] For example, in 1973 (seven years before Mrs. Gibbons began using Shower to Shower), an outside consultant submitted a technical report to respondent that advised in part: "We have
(*Fn. is continued on the next page.*)

10

Documents in the second set of exhibits were less technical. Like Hopkins's deposition testimony submitted by appellants, these documents focused on what respondent knew concerning the health hazards of asbestos exposure.[7] This evidence was primarily intended to support appellants' punitive damages claim.

---

examined a specimen of Vermont talc designated No. 32-71S by transmission electron microscopy to determine whether any asbestiform materials were present and have found none. [¶] Specifically, we found no chrysotile or tremolite, but we did find the serpentine mineral antigorite (ASTM Card 9-444), a hydrated magnesium silicate, 6-layer ortho type. We identified antigorite by its characteristic electron diffraction pattern which corresponds exactly to patterns which we have obtained from standard antigorite samples and from antigorite which was found in the Windsor Mine [not Hammondsville or Argonaut]. [¶] We have enclosed sample diffraction patterns from the antigorite standard and from the antigorite which we found in this sample. As mentioned previously in this report, we could find no indications of chrysotile or tremolite. The talc was very blocky in form and was not the normal, flaky talc which we associate with the Vermont Ore. This may be due, in part or in total, to the pre-processing of this particular talc specimen, e.g., to inadequate grinding of the material to break it down into the finer flakes, since all of the materials that we found, even the antigorite, seemed to be blocky in form."

[7] Hopkins is not a geologist. As the person most qualified to speak for respondent, he testified respondent never found asbestos particles in any of its source mines. Hopkins agreed with the questioner's statements that "[t]here's no place for [asbestos in any cosmetic talc], correct?" and "that has always been [respondent's] policy as long as [he could] remember, as well as from the documents [he] reviewed; correct?"

11

Appellants' points and authorities in opposition to respondent's summary judgment motion made sweeping statements concerning the presence of asbestos in the Hammondsville and Argonaut mines (e.g., testing of talc from those mines "has repeatedly shown the presence of amphibole and chrysotile asbestos") and in Shower to Shower and Johnson's Baby Powder (e.g., testing of these products "has consistently shown the presence of asbestos"). Appellants supported these statements with references to 132 "additional material facts." (Capitalization omitted.) The additional material facts identified exhibits to Gurien's declaration by number and typically included only the attorney's one-sentence characterization of the exhibit's text or data.[8]

Although appellants had designated experts in their lawsuit, they did not submit an expert declaration in opposition to the summary judgment motion. At the hearing, appellants' counsel argued JJCI's documents, coupled with Mrs. Gibbons's undisputed use of JJCI talc

---

[8] Some exhibits also referenced pages from Hopkins's deposition where he answered questions concerning certain exhibits, referred to by number. References to these exhibits by number are of little practical value to this court, however. Although overlap certainly exists between appellants' exhibits in opposition to the summary judgment motion and the exhibits Hopkins discussed in his deposition, the same documents have different exhibit numbers. This is akin to incorporating by reference trial court arguments into an appellate brief, a violation of the rules of appellate practice.

12

products for 20 years, meant "as a matter of odds," Mrs. Gibbons must have been exposed to asbestos.

Appellants did not ask the trial court to continue the hearing on respondent's summary judgment motion so they could submit an expert declaration. Appellants did not depose Sanchez in order to challenge his qualifications, opinions, or conclusions, nor did they seek a continuance of the hearing in order to do so.[9]

## III
### *Summary Judgment Hearing and*
### *Trial Court Ruling*

The hearing on respondent's motion for summary judgment focused on whether an expert declaration was necessary to raise a triable issue of material fact. Appellants' counsel argued no expert testimony was necessary because "[t]he documents themselves create a fact issue as to whether the Vermont mines [were contaminated with] . . . asbestos." Appellants' counsel suggested a jury could "infer from all of those documents a common sense . . .

---

[9] Appellants located a container of Shower to Shower cosmetic powder actually used by Mrs. Gibbons. Appellants produced it to respondent after the motion for summary judgment was filed. Respondent tested the product; no asbestos was detected. Sanchez then submitted a second declaration along with respondent's reply brief.

We have not considered that declaration or any other evidence presented for the first time in respondent's reply papers.

13

inference that [the Hammondsville and Argonaut mines were contaminated]."

The trial court, after noting appellants did not seek a continuance to conduct more discovery or to obtain an expert declaration, granted respondent's motion for summary judgment: "[Sanchez's declaration] is affirmative evidence that the talc was not contaminated with asbestos, that there's no scientific way . . . anybody can link the . . . asbestos . . . claimed to have been found [in] Mrs. Gibbons [with respondent's products]. And I think that that did put the burden on [appellants], and I think that it is something that requires expert testimony. [¶] I just don't think that a jury can possibly draw the inferences just from the documents alone that [Mrs. Gibbons] would have been exposed to asbestos . . . in the talc that she . . . [used]."

Appellants promptly sought reconsideration of the order granting summary judgment. (§ 1008.) They cited newly acquired evidence -- including United States Geological Survey documents obtained via a Freedom of Information Act request -- and supported the motion for reconsideration with, inter alia, a declaration by a professional geologist who reviewed geological survey documents and concluded there is a "likelihood of chrysotile and amphibole minerals occurring in close proximity to or at the edges of the talc ore" in the Vermont county where the Hammondsville and Argonaut talc mines were located. Respondent opposed the motion. After a reported hearing, the trial court denied the motion for reconsideration.

Appellants timely appealed.

14

# DISCUSSION

## I

### *Summary Judgment: Standard of Review and General Governing Principles*

Our review of the record in this appeal is de novo. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037.) We begin our analysis with the moving party's separate statement to determine whether it makes "a prima facie showing of the nonexistence of any triable issue of material fact" (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*)). "A prima facie showing is one that is sufficient to support the position of the party in question. . . . No more is called for." (*Id.* at p. 851, citation omitted.)

A moving party that satisfies its burden "causes a shift, and the opposing party is then subjected to a burden of production of [its] own to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar, supra,* 25 Cal.4th at p. 850.) At this point, the opposing party cannot simply stand on its pleadings, but must respond with "specific facts showing that a triable issue of material fact exists . . . ." (§ 437c, subd. (p)(2).) "Each material fact contended by the opposing party to be disputed shall be followed by a reference to the supporting evidence." (*Id.* at subd. (b)(3).)

15

# II

## *The Sanchez Declaration Shifted the Burden to Appellants to Produce Evidence of Threshold Exposure to Asbestos From JJCI's Talc Products*

Appellants attack the Sanchez declaration on two fronts.  First, they contend the trial court erroneously overruled a number of objections to the declaration.  Second, appellants maintain "that, even without considering the objections the trial court overruled," what remained of the Sanchez declaration after other objections were sustained was insufficient to shift the burden to them to raise a triable issue of material fact as to Mrs. Gibbons's exposure to asbestos through her use of respondent's talc products. Neither contention has merit.

### A.    *Evidentiary Error*

Appellants do not identify evidentiary error in a heading or subheading in their opening brief.  (Cal. Rules of Court, rule 8.204(a)(1)(B).)  Respondent argues appellants have forfeited this claim of error.  (*Pizarro v. Reynoso* (2017) 10 Cal.App.5th 172, 179 ["Failure to provide proper headings forfeits issues that may be discussed in the brief but are not clearly identified by a heading"].)  In their reply brief, appellants seek to avoid forfeiture by contending they "went on to specifically identify and discuss the overruled objections and explain[] why the objections should have been sustained."  This contention overstates the cursory treatment appellants gave the evidentiary error discussion in the opening brief.  Moreover, appellants fail to cite any

16

apt authority to support their position. However, with one exception, we conclude their perfunctory arguments minimally comply with rule 8.204(a) of the California Rules of Court.[10]

The weight of authority in this state is that we apply an abuse of discretion standard when we review trial court evidentiary rulings. (*Duarte v. Pacific Specialty Ins Co.* (2017) 13 Cal.App.5th 45, 52 & fn. 7.) The challenged evidentiary rulings were well within the trial court's discretion.

Nine objections based on relevance were directed to Sanchez's statements concerning respondents' post-World War II talc sources other than Vermont's Hammondsville and Argonaut mines. Appellants identified the other mines in their own statement of material facts and submitted documents and excerpts from Hopkins's deposition testimony concerning them. Appellants did not object to a number of paragraphs in Sanchez's declaration that discussed the other mines (e.g., ¶¶ 47-51, 53, 62). Although a ruling on the motion for summary judgment does not depend on this evidence, the trial court did not abuse its discretion in overruling the objections.

---

[10] Where appellants merely incorporate their trial court arguments concerning specific objections (e.g., objection 4) into their opening brief, we disregard them. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 294 & fn. 20; *Parker v. Wolters Kluwer United States, Inc.* (2007) 149 Cal.App.4th 285, 290.)

Appellants' objection that paragraph 16 of Sanchez's declaration lacked foundation also was properly overruled. There, the defense expert prefaced his opinion concerning talc testing with, "It is well known to mineralogists . . . ." In this court, appellants argue Sanchez's declaration stated "he is a geologist, . . . [not] . . . a mineralogist [and does not] demonstrate any expertise that would qualify him as an expert in mineralogy." Sanchez holds a doctorate degree in geology and is a member of the Mineralogical Society of America and the Mineralogical Association of Canada. His declaration describes years of experience analyzing talc and asbestos, both minerals. The dictionary defines "mineralogy" as the "science dealing with minerals, their crystallography, properties, classification, and the ways of distinguishing them." (At <http://www.merriam-webster.com/dictionary/mineralogy> [as of Jan. 15, 2020].) Sanchez presented an adequate foundation for his mineralogy opinions. (Evid. Code, § 720, subd. (a).)

Appellants' entire argument in their opening brief concerning objections to paragraphs 55, 59, and 110 of the Sanchez declaration, where the expert opined that respondent's Vermont talc did not contain asbestos, is as follows: "[Appellants] objected that those statements lacked foundation, constituted improper expert opinion, and contained inadmissible hearsay, because they were used to introduce the hearsay content of 'scientific literature,' 'past geological investigations,' and 'past peer-reviewed/refereed publications.'" Appellants "objected on the same grounds to

18

paragraphs 93 and 110[11] of Sanchez's declaration, wherein he stated that [respondent's] talcum powder products did not contain asbestos. . . . [T]hose statements were . . . used to introduce the hearsay content of a purported 'decades-long testing record, including historical testing by JJCI and its suppliers, independent third-party testing, and historical government testing.'"

Not one of these paragraphs includes content from any testing records. These paragraphs contrast with paragraphs 56 through 58, which do include information from historical testing; and appellants' objections to those paragraphs were sustained.

In the challenged paragraphs, Sanchez did no more than identify the sources for his opinion. Accordingly, the evidence was properly received. (*Fuller v. Department of Transportation* (2019) 38 Cal.App.5th 1034, 1044 ["Evidence Code section 1200 bars an expert from reciting parts of a hearsay document for the truth of the matter stated. There is a distinction to be made between allowing an expert to describe the type or source of the matter relied upon as opposed to presenting, as fact, case-specific hearsay that does not otherwise fall under a statutory exception"]; *McCleery v. Allstate Ins. Co.* (2019) 37 Cal.App.5th 434, 453 [expert may rely on and identify ""the matters on which he

---

11   Appellants mentioned paragraph 110 twice.

Paragraph 93 simply identified the types of records Sanchez reviewed in reaching his opinion ("historical testing by JJCI and its suppliers, independent, third-party testing, and historical government testing").

or she relied, [but] . . . may not testify as to the details of those matters if they are otherwise inadmissible""""].)

Appellants also fault the trial court for overruling their objections to paragraphs 84 and 85, contending Sanchez "stated that the 'chances' of asbestos contamination occurring in a finished talc product 'are so small as to approach the impossible,' and that 'there is no scientific methodology or test that could support an opinion' regarding universal contamination of a product over a period of time. [Citation to record.] [Appellants] objected that those statements lacked foundation and constituted improper expert opinion."

Appellants do not provide context for the challenged statements. The selective quotations and the paraphrasing of the rest of the expert's statements are also somewhat misleading. Paragraphs 84 and 85 were part of Sanchez's larger discussion concerning the "occurrence[] of non-talc minerals in talc deposits" (capitalization and underlining omitted) and what must happen during the mining, milling and manufacturing processes before "asbestos contamination [can] occur in a finished talc product." The discussion included 11 preceding and three following paragraphs to which no objections were made. Those paragraphs provided the foundation for the expert's conclusions in paragraphs 84 and 85 that "there is no scientific methodology or test that could support an opinion that particular containers of [respondent's] talc used by an individual over a period of years were all contaminated with asbestos, absent testing of the talc in each of the actual containers."

20

Whether Shower to Shower and Johnson's Baby Powder were contaminated with asbestos was a proper subject for expert opinion. (Evid. Code, § 805 [an expert opinion is "not objectionable because it embraces the ultimate issue to be decided by the trier of fact"]; see also *WRI Opportunity Loans II, LLC v. Cooper* (2007) 154 Cal.App.4th 525, 532, fn. 3 [Evid. Code, § 805 typically "permits expert testimony on the ultimate issue to be decided"].) The trial court did not abuse its discretion in overruling the objections to paragraphs 84 and 85.

### B. Sufficiency of the Sanchez Declaration to Shift the Burden

The Sanchez declaration established "a prima facie showing of the nonexistence of any triable issue of material fact" (*Aguilar, supra,* 25 Cal.4th at p. 850). As mentioned, appellants succeeded in excluding only 12 paragraphs from the expert's declaration. Evidence in the remaining 98 paragraphs, summarized *ante*, provided prima facie proof the talc products Mrs. Gibbons used were not adulterated with asbestos and did not expose her to asbestos. The burden shifted to appellants to make a contrary prima facie showing.

### III

### *Summary Judgment: Asbestos Exposure*

More than 20 years ago, our Supreme Court announced a two-step test for holding manufacturers of asbestos-containing products liable for asbestos-related latent

21

injuries: "[T]he plaintiff must first establish some threshold *exposure* to the defendant's defective asbestos-containing products, *and* must further establish in reasonable medical probability that a particular exposure or series of exposures was a 'legal cause' of his injury, i.e., a *substantial factor* in bringing about the injury. . . . [T]he plaintiff may meet the burden of proving that exposure to defendant's product was a substantial factor causing the illness by showing that in reasonable medical probability it was a substantial factor contributing to the plaintiff's or decedent's risk of developing cancer." (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 982-983, fn. omitted.) If an asbestos plaintiff fails to prove exposure, there is no causation and no liability as a matter of law. (*McGonnell v. Kaiser Gypsyum Co.* (2002) 98 Cal.App.4th 1098, 1103 (*McGonnell*).)

Numerous appellate decisions address summary judgment motions by manufacturers of products that include asbestos in their formulae. If the defendant manufacturer meets "its initial burden of production by making a prima facie showing that [the] plaintiff does not have, and cannot obtain, evidence necessary to show exposure to an asbestos-containing [product]," the opposing asbestos plaintiff must present evidence of sufficient quality to raise a triable issue of material fact as to exposure. (*Collin v. CalPortland Co.* (2014) 228 Cal.App.4th 582, 594; *McGonnell, supra,* 98 Cal.App.4th at p. 1105.) The material issue is exposure to the product itself; and it is not uncommon for asbestos plaintiffs to rely on their own testimony or testimony by family members or coworkers, i.e., from individuals other than experts, or on business records detailing the purchase

22

and placement of asbestos products at jobsites or in work environments. Even "'circumstantial evidence . . . sufficient to support a reasonable inference'" of exposure may defeat summary judgment. (*Casey v. Perini Corp.* (2012) 206 Cal.App.4th 1222, 1237.)

Asbestos plaintiffs in lawsuits where the product, although not containing asbestos, was designed to inevitably expose them to asbestos similarly may defeat summary judgment with nonexpert testimony that they used the product. (E.g., *Hetzel v. Hennessy Industries, Inc.* (2016) 247 Cal.App.4th 521, 526 [summary judgment for the defendant reversed where plaintiff established her husband worked with its brakeshoe-grinding machines, which ""'had no other function than to grind asbestos-containing brake linings'""].)

Plaintiffs who allege they developed mesothelioma as a result of exposure to asbestos-contaminated talcum powder products face a different challenge. Cosmetic talc products such as Shower to Shower and Johnson's Baby Powder are not formulated to contain asbestos or to necessarily be used in the presence of asbestos. The material issue in a talc asbestos case is not the plaintiff's exposure to the product, but the plaintiff's exposure to asbestos through use of a talc product not designed to contain that mineral. In other words, the question is whether it is more likely than not that the talc product was contaminated with asbestos during the time the plaintiff used it.

To date, no reviewing court has held a talc asbestos plaintiff has raised a triable issue of material fact on the exposure and contamination issue without expert

testimony.[12] *Lyons v. Colgate-Palmolive Co.* (2017) 16 Cal.App.5th 463, 471 (*Lyons*) is instructive on this point.

In *Lyons,* the plaintiff used Cashmere Bouquet talcum powder for 20 years. She developed mesothelioma and sued. The defendant moved for summary judgment and supported the motion with "expert testimony that Cashmere Bouquet 'was free of asbestos.'" (*Lyons, supra,* 16 Cal.App.5th at p. 467.)

Lyons opposed the motion with volumes of evidence, including a declaration by an expert geologist, Sean Fitzgerald. (*Lyons, supra,* 16 Cal.App.5th at p. 466.)

---

[12] Similarly, to date, no reviewing court has been presented with verified admissions or discovery answers by a talc manufacturer that might obviate the need for an opposing expert declaration.

Nor is this a case where the manufacturer's counsel has conceded contamination of its products. Efforts by appellants' counsel to demonstrate otherwise during oral argument in this court are not supported by the record.

At the hearing on its summary judgment motion, respondent's counsel commented, "at best, we can speculate that somehow these documents from 1970, you know, obviously we dispute what [appellants] say they say. But for purposes of the motion, because we viewed . . . the evidence in the light most favorable to [appellants], let's assume that these handful of documents demonstrate that some talc was contaminated with asbestos." Respondent's counsel added, "a little bit of asbestos in one sample out of . . . multiple, multiple samples that were being tested, without an expert saying, yes, that makes it more likely than not that the products that Mrs. Gibbons were using is contaminated, without that . . . bridge, they just haven't gotten there." These statements fall far short of concessions that could take the place of an opposing expert declaration.

Fitzgerald "'personally confirmed the presence of asbestos in all three mine sources and the Cashmere Bouquet products . . . [through] years of repeated testing by industry-standard asbestos analytical techniques.'" (*Ibid.*)  Fitzgerald expressed his opinion "'to a reasonable degree of scientific certainty, that [the plaintiff] was repeatedly exposed to significant airborne asbestos . . . by her use of Cashmere Bouquet talcum powder products.'" (*Id.* at p. 467.) Fitzgerald's "declaration include[d] 39 exhibits totaling close to 800 pages, consisting of scientific papers, geological surveys and other documents supporting these conclusions." (*Ibid.*)

The trial court granted summary judgment in the defendant's favor, but the Court of Appeal reversed.  The appellate panel acknowledged the volumes of evidence presented by the plaintiff, but considered only Fitzgerald's expert testimony.  (*Lyon, supra,* 16 Cal.App.5th at p. 471.) Noting the defendant had waived any objections to Fitzgerald's declaration (*id.* at p. 468), *Lyons* held:  "The only question here is whether the Cashmere Bouquet [the plaintiff used for 20 years] contained asbestos.  As to that critical issue, while [the defendant] has produced evidence tending to show that it did not, the testimony of Fitzgerald unquestionably creates a triable issue that it did, without considering any of [Lyons's] other evidence." (*Id.* at p. 471.)

*Berg v. Colgate-Palmolive Co.* (2019) 42 Cal.App.5th 630 (*Berg*) is also a talc asbestos case, and it represents the other side of the coin.  Berg developed mesothelioma decades after he used the defendant's Mennen Shave Talc.  The defendant moved for summary judgment on the ground Berg

25

could not demonstrate the talc product contained asbestos. (*Id.* at p. 632.) The defendant supported the motion with a declaration by Sanchez, the same expert retained by respondent in this case.

Berg opposed the summary judgment motion with a declaration by Fitzgerald, the same expert retained by the plaintiff in *Lyons.* Fitzgerald explained the defendant's talc was sourced from mines that "'historically'" were contaminated with asbestos, and testing in the 1970's by the FDA showed the presence of asbestos in Mennen Shave Talc. (*Berg, supra,* 42 Cal.App.5th at p. 632.) Fitzgerald personally tested samples of Mennen Shave Talc and "all showed 'countable structures of amphibole' minerals, the majority of which 'were clearly asbestiform in crystalline habit.'" (*Id.* at p. 633.) Fitzgerald concluded "'to a reasonable degree of scientific certainty'" the Mennen Shave Talc that Berg used contained asbestos. (*Ibid.*)

The trial court granted the defendant's motion for summary judgment, and the Court of Appeal affirmed. The appellate panel rejected Berg's contention that he "presented evidence from which a jury could conclude 'that all or virtually all of the Mennen Shave Talc products during the relevant period' contained asbestos. . . . At best, [Berg] presented evidence that it was possible the shave talc [he] used exposed him to asbestos, but [he] failed to present evidence upon which a reasonable jury could conclude that any such exposure was more likely than not." (*Berg, supra,* 42 Cal.App.5th at p. 635; see also *Andrews v. Foster Wheeler LLC* (2006) 138 Cal.App.4th 96, 108 ["'The mere "possibility" of exposure does not create a triable issue of fact'"].)

26

**IV**

*Appellants Did Not Demonstrate the Existence of a Triable Issue of Fact as to the Presence of Asbestos in the JJCI Talc Products Mrs. Gibbons Used*

**A.    No Specific Facts**

In their formal discovery answers and opposition to respondent's summary judgment motion, appellants relied almost exclusively on JJCI documents and excerpts from Hopkins's deposition testimony.[13]  As voluminous as those documents are, they do not contain the "specific facts" necessary to raise a triable issue of material fact.  (§ 437c, subd. (p)(2).)  Many are highly technical and lack explanations in layperson's terms.  Many include only snippets of test results of raw talc based on miniscule sample sizes.  Many were not created, and do not reflect information available, during the years Mrs. Gibbons used Shower to Shower and Johnson's Baby Powder (see, e.g., appellants' additional material facts nos. 16 through 39, 43 through 50, 53 through 56, 68 through 73, 87 through 102); and there is no explanation as to why they are relevant to demonstrate it is more likely than not that any of the talc products Mrs. Gibbons used between 1980 and 2000, when JJCI's talc was

---

[13]    A reasonable inference from the record is that these JJCI, bates-stamped documents are among the documents Sanchez reviewed in forming the opinion that JJCI's talc products are not contaminated with asbestos.

27

sourced from Hammondsville and Argonaut, contained asbestos.[14]

---

[14] Appellants' additional material facts nos. 123 and 124 provide examples of the lack of specificity and descriptive hyperbole. They include the following unequivocal statements: "123. In 1976, [JJCI] prepared, in advance, 'Appropriate responses' and 'refutations' to Dr. Langer's study demonstrating asbestos in consumer talc products. [¶] 124. In 1972, [JJCI] tried to discredit Dr. Lewin when he reported asbestos in its talc products." As supporting evidence for both statements, appellants cite exhibits 82, 83, and 84, and two excerpts from Hopkins' deposition.

Exhibit 82 is a three-page memo dated October 1, 1976. Item 5 in the memo is listed as "Langer Paper 'Consumer Talcum Powders.'" The entire comment in exhibit 82 concerning the "Langer Paper" is: "This paper will appear in the November '76 issue of the Journal of Toxicology and Environmental Health. Appropriate responses are being organized." Nothing in the memorandum summarizes the Langer paper or suggests Dr. Langer demonstrated that asbestos had been found in any talc products, much less JJCI's products. The word "refutations" does not appear in exhibit 82.

Exhibit 83 is a one-page, November 15, 1976 letter from JJCI to Dr. J. Krause of the Colorado School of Mines Research Institute. It references Krause's letter to the editor of the Journal of Toxicology & Environmental Health "wherein [Krause] refute[s] Langer's recent work." This exhibit provides no information as to the substance of Langer's work or Krause's criticism. Additionally, the memo advises that two one-pound bottles of Italian talc are included with the memo, and the "lot is truly representative of Italian high grade cosmetic talc presently being distributed on the world markets."

Exhibit 84 is a three-page memo dated September 25, 1972. This exhibit detailed a meeting concerning talc from Italy, not Hammondsville or Argonaut. One expert reported the Italian
*(Fn. is continued on the next page.)*

28

Moreover, statements by appellants' counsel in the "additional material facts" portion of the summary judgment opposition that purport to describe exhibits identified only by date and/or number have no evidentiary value. Attorney characterizations do not themselves constitute specific evidentiary facts.

## B.    *No Rebuttal of Respondent's Expert Testimony*

Appellants maintain mesothelioma plaintiffs do not need expert testimony to make a prima facie case of asbestos exposure and defeat summary judgment in talc asbestos cases. They cite no authority to support the contention; and it is contrary to *Lyons* and *Berg*.

---

mine "contains no deposits of chrysotile asbestos and very minor amounts of tremolite." The author of the memo noted JJCI's "data are now conclusive and contain new information on the composition of Italian talc which may explain the errors of Dr. Lewin . . . ." Lewin attended the meeting and presented his test results from two lots of Shower to Shower, both sourced from Italy. Lewin's findings were based on X-ray diffraction patterns. According to the memo, Lewin agreed to work with two critics of his study (Drs. McCrone and Schaffner) to develop a microscopy protocol as "[i]t was obvious that the X-ray scan did not show definite chrysotile [and] microscopy was indicated . . . ."

Hopkins's deposition testimony is also not specific. Hopkins was only asked if he was "aware" of a 1976 peer-reviewed article published by Langer and two colleagues that "look[ed] at the asbestos in 20 different consumer talcum powder products; correct?" He was, but in the cited testimony, he was not asked whether any JJCI talc products sourced from Hammondsville or Argonaut mines were included in the article.

Appellants' argument that "[i]t does not require an expert to explain to a jury that there was asbestos in the Vermont talc" is conclusory as to the type of evidence that is within a layperson's ken. It sidesteps the need for expert testimony to rebut Sanchez's expert opinion "to a reasonable degree of scientific certainty" that respondent's talcum powder products are free of asbestos. (*Bozzi v. Nordstrom, Inc.* (2010) 186 Cal.App.4th 755, 761.) At the summary judgment stage, allegations alone that Vermont talc mines contained asbestos and JJCI's talcum powder products were contaminated with the mineral are insufficient to raise a triable issue of material fact. So are an attorney's conclusions concerning scientific and technical evidence.

Appellants nonetheless urge reversal based on *Lyons, supra,* 16 Cal.App.5th 463, arguing "nowhere in [the *Lyons'*] opinion . . . did the [appellate] court state or suggest that an expert declaration is *required* to raise a triable issue of fact as to asbestos content in a case alleging injury from exposure to a talcum powder that contained or was contaminated with asbestos." There was no need in *Lyons* to discuss the necessity of an opposing expert's declaration: The plaintiffs opposed the defense summary judgment motion with an expert's comprehensive declaration, to which no objections were either made or sustained. The issue in *Lyons* was whether the opposing expert's declaration raised a triable issue of material fact; volumes of other evidence were not even considered. (*Id.* at p. 471.)

The same issue was presented in *Berg.* There, however, the appellate panel held an opposing expert declaration based only on a possibility, rather than a

probability, that the plaintiff's shave talc was contaminated with asbestos was insufficient to raise a triable issue of material facts. (*Berg, supra,* 42 Cal.App.5th at p. 635; see also *McGonnell, supra,* 98 Cal.App.4th at p. 1106 ["An expert's speculations do not rise to the status of contradictory evidence, and a court is not bound by expert opinion that is speculative or conjectural. [Citations.] [The] [p]laintiffs cannot manufacture a triable issue of fact through use of an expert opinion with self-serving conclusions devoid of any basis, explanation, or reasoning"].)

Appellants did not demonstrate it was more likely than not that Mrs. Gibbons was exposed to asbestos through adulterated talc products manufactured by respondent from Hammondsville or Argonaut talc. Unlike *Lyons*, appellants did not present the trial court with an opposing -- and unchallenged -- expert declaration. Unlike *Berg* and *McGonnell,* appellants did not even present the trial court with "speculative or conjectural" expert opinion.

Instead, appellants relied on hundreds of pages of mostly technical and scientific documents that predated or postdated Mrs. Gibbons's use of Shower to Shower and Johnson's Baby Powder and dealt with mines other than Hammondsville and Argonaut. Appellants did not reiterate specific evidentiary facts retrieved from the documents that were admitted into evidence. Rather, they depended on their attorney's declaration, which simply identified and attached 91 exhibits ("Attached hereto as Exhibit [insert number] is a true and correct copy of . . . .").

An opinion by a plaintiff's expert to a "'reasonable degree of scientific certainty'" that mined talc or

31

manufactured talcum products were contaminated with asbestos is insufficient to prevent summary judgment in a defendant's favor if the expert's declaration includes "readily apparent [deficiencies in the supporting factual foundation]." (*Berg, supra,* 42 Cal.App.5th at p. 636.) The rule is not more lenient when the declarant is not an expert, but the plaintiff's attorney. Viewing appellants' evidence "in its best light," we are presented only with a possibility of contamination and "speculation that . . . 'narrow[s] into conjecture.'" (*McGonnell, supra,* 98 Cal.App.4th at p. 1105.) Summary judgment in respondent's favor was properly granted.

## DISPOSITION

The judgment is affirmed.  Respondent is awarded costs on appeal.

## CERTIFIED FOR PUBLICATION


DUNNING, J.*


We concur:



MANELLA, P. J.



WILLHITE, J.

---

*Retired Judge of the Orange Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.